478 So.2d 1298 (1985)
CENTRAL METAIRIE CIVIC ASSOCIATION, Leonard Cline, Michael Mitchel and N. Kreig White
v.
PARISH OF JEFFERSON.
No. 85-CA-278.
Court of Appeal of Louisiana, Fifth Circuit.
November 12, 1985.
Writ Denied January 24, 1986.
*1299 William H. Reinhardt, Jr., Kevin W. Kern, Post, Reinhardt & Rougelot, Metairie, for plaintiffs-appellants.
Hubert A. Vondenstein, Parish Atty., Louis G. Gruntz, Jr., Asst. Parish Atty., Gretna, for defendants-appellees.
David R. Sherman, Steven E. Hayes, Gauthier, Murphy, Sherman, McCabe and Chehardy, Kenner, for defendant-appellee.
Before BOUTALL, CURRAULT and DUFRESNE, JJ.
CURRAULT, Judge.
This appeal originates in the Twenty-Fourth Judicial District Court, Division "N", Parish of Jefferson, wherein the Honorable James L. Cannella affirmed the granting of a variance by the zoning appeals board, Parish of Jefferson, holding such decision not to be arbitrary, capricious or manifestly erroneous. We affirm.
On September 16, 1983, Gerson Tolmas, owner of a tract of property consisting of approximately fourteen acres and zoned C-2, applied to the Jefferson Parish Zoning Appeals Board (hereinafter, the Board) for a variance waiving certain front, side and rear yard requirements of the comprehensive zoning ordinance of Jefferson Parish (hereinafter, the Ordinance). An initial public hearing was held on October 17, 1983, at which time the Board voted to grant the variance. However, it was discovered that the hearing, along with all hearings scheduled on that date, had been advertised only once, not twice, as is required by law.
Mr. Tolmas reapplied for the variance which was rescheduled to be heard on November 28, 1983. After proper advertisement, a second public hearing was held with testimony taken and exhibits received. *1300 However, the Board deferred rendering a decision at that time because, in the interim, the Jefferson Parish Council had commissioned a study on the impact of the project that was proposed for the Tolmas tract.
After completion of that study, a final public hearing was held February 6, 1984. At this hearing, more testimony was taken and exhibits received. This included three impact studies: one by the developer; one by the Parish; and one by Jefferson Parish's traffic engineer, Mr. Carl Bordelon. Again, the Board voted to grant the variance.
The Central Metairie Civic Association, Inc., Leonard Cline, Michael Mitchel and N. Kreig White, applied for certiorari to the Twenty-Fourth Judicial District Court naming Jefferson Parish respondent. At the trial court's request, Metairie Center Joint Venture, which purchased the tract from Tolmas after the variance was granted, was joined as a party defendant-respondent. The trial court also issued an order granting plaintiffs-relators the right: (1) to introduce the testimony of two expert witnesses, one in the area of "zoning matters" and the other in "real estate appraisal"; (2) to supplement the record with ten applications for height variances previously brought before the Board; and (3) to depose each member of the Board to determine whether any violations of the "Open Meeting Law" occurred.
The trial court, after a complete and thorough trial, affirmed the decision of the Board. Plaintiffs-relators have appealed, asserting as error the following:
that (1) the district court erred in refusing to allow plaintiffs to cross-examine the members of the Zoning Appeals Board as to the basis for their decision, and to cross-examine the authors of the various reports which were submitted to the Board for their consideration and which were in evidence before the district court; that
(2) the district court erred in concluding that the Zoning Appeals Board is a quasijudicial body and is not subject to the Open Meetings Law, LSA-R.S. 42:4.1 et seq; that
(3) the district court erred in finding that the alterations of the applications to the Zoning Appeals Board constituted harmless error; that
(4) the district court erred in finding that the Zoning Appeals Board effectively adopted the judgment prepared by the clerical secretary; that
(5) the district court erred in affirming the decision of the Zoning Appeals Board and rendering judgment in favor of defendants, dismissing plaintiffs' suit; that
(6) the district court erred in finding that the grant of the variance met the criteria set forth in Section XXII 3B of the Jefferson Parish Zoning Ordinance; that
(7) the district court erred in affirming the action of the Zoning Appeals Board without itself finding that requirement XXII 3B(3) of the Jefferson Parish Zoning Ordinance had been met; that
(8) the district court erred in concluding that the Zoning Appeals Board did not act in an arbitrary and capricious or manifestly erroneous manner; that
(9) the district court erred in concluding that the decision of the Zoning Appeals Board was supported by the evidence; and that
(10) the district court erred in distinguishing between the effect of the variance and the effect of the project without any evidence as to the effect on the parameters of the ordinance if the project was built without a variance.

ERROR 1
Appellants complain they were denied, by the trial court, their right to cross-examine the members of the Board as to the basis for their decision and to cross-examine the authors of the various reports which were submitted to the Board for their consideration and which were in evidence before the trial court. Appellants, in essence, argue they were denied substantive due process of law by the action of the trial court.
Appellants appeared at the second and final hearings and were permitted unrestrained cross-examination of appellee's *1301 witnesses. At the final hearing, appellants' attorney conducted cross-examination of Noel Brodtman, President of Environmental Professionals, Ltd., the firm commissioned by the parish to conduct their impact study, and Ernie Hanchey, Project Designer and Coordinator with Harwood K. Smith and Partners, Architects. As to appellee's remaining experts, it is clear that appellants were never denied the opportunity to cross-examine as such was neither requested nor attempted. With respect to the Bordelon report, appellants failed to call the author of the report which they introduced into evidence at the February 6, 1984 hearing.
Even if appellants had been completely denied an opportunity to cross-examine opposition witnesses, which is not the case, such denial would not have deprived appellants of their Fourteenth Amendment right to due process. U.S. Const. amend. 14, § 1, In re Coleman, 242 So.2d 602 (La.App. 4th Cir.1970). Regardless, it is apparent from a reading of the February 6, 1984 transcript that the Board was lenient in accommodating everyone present to insure the proceeding was conducted with sound fundamental fairness.
The trial court, in reviewing the decision of the Board, has the discretion to allow additional testimony or evidence; and in fact, exercised that discretion by allowing appellants to depose the Board members and introduce the testimony of two expert witnesses, one on "zoning matters" and the other on "real estate appraisal." The questioning of the Board members was limited to determining whether any violations of the "Open Meeting Law" occurred. Appellants argue this limitation to be error.
Courts are not permitted to inquire into the motives of governing authorities in enacting ordinances which rezone property. Meyers v. City of Baton Rouge, 185 So.2d 278 (La.App. 1st Cir.1966). Although the rule articulated in Meyers applied to those legislative bodies enacting zoning ordinances, the rationale promoting such rule logically extends to provide protection to those quasi-judicial bodies whose powers are enumerated in LSA-R.S. 33:4727C(3). This rule has been recognized and applied by the Supreme Court of Connecticut. In the case of Welch v. Zoning Board of Appeals, 158 Conn. 208, 257 A.2d 795, 798 (Conn.1969), the Connecticut Supreme Court stated:
"The short answer to the effort to cross-examine the members of the board is that cross-examination of the members of the board was not permissible either at the original hearing or on the appeal in the court below.... `Just as a judge cannot be subjected to such a scrutiny, * * * so the integrity of the administrative process must be equally respected.'" (Citations omitted)
We are of the opinion that as to the motives, good faith or wisdom of any Board member, the rule articulated in Welch, supra, is sound. Further, we do not find abuse of discretion on the part of the trial court in allowing Board members to be deposed on a narrow issue that bears a reasonable and logical relationship to public interest.

ERROR 2
During the February 6, 1984 hearing, the Board adjourned briefly and went into executive session with the parish attorney to discuss the various possibilities with regards to granting or denying the variance with or without stipulations. Appellants argue that that session violated Louisiana's Open Meeting Law, LSA-R.S. 42:4.1 et seq.
LSA-R.S. 42:4.2(B) defines "public body" for the purposes of Louisiana's Open Meeting law. Although zoning and planning commissions are specifically named as "public bodies," boards of adjustment (zoning appeals board) are not included. Boards of Adjustment are defined under LSA-R.S. 33:4727 and are clearly quasi-judicial in nature and function. State ex rel. Bringhurst v. Zoning Board of Appeal and Adjustment, 198 La. 758, 4 So.2d 820 (La.1941); River Oaks-Hyman Pl. H. Civ. A. v. City of New Orleans, 281 So.2d 293 (La.App. 4th Cir.1973). The trial court did not err in holding the Zoning Appeals Board to be a quasi-judicial body and therefore *1302 not subject to Louisiana's Open Meeting Law.

ERRORS 3 AND 4
Appellants contend that the Board and its personnel were guilty of improper procedure in handling the variance application. The trial court recognized three technical irregularities asserted by the appellants to be error, but harmless. After complete review of the record and careful deliberation, we find the trial judge did not commit manifest error as to these allegations of error.
The variance was initially requested under Ordinance Section XIV 4(a), 1(a) and 2(a). However, Beryl Ferrara, employed by Jefferson Parish as secretary to the Board, changed the application to Ordinance Section XX-2(a). On February 6, 1984, the Board granted the variance pursuant to Section XX-2(a). Appellant complains this unauthorized alteration of the application is reversible error.
Ms. Ferrara testified she followed a common practice of the Board in changing the application to indicate the correct section of the Ordinance. According to Ms. Ferrara, applications are taken by building permit officers who often cite wrong sections. She further explained that many individuals who apply do not know what part of the Ordinance applies to their particular situation even though they know that without a variance they would not be in compliance with zoning regulations.
The record clearly indicates that changes such as this are routinely made, Ms. Ferrara so testified. While the trial court concluded such procedure constituted error, we agree that whatever error committed was harmless in that it was neither done in bad faith nor did it adversely affect or prejudice any of appellants' substantial rights.
At both the November 28, 1983 and February 6, 1984 hearings, all parties present were fully apprised of the variance sought. Appellants were represented by counsel at both hearings and were given a complete and unrestricted opportunity to present evidence on behalf of their opposition and to participate fully in the hearings. Appellants' counsel confronted and cross-examined, as did the Board, appellee's experts. Appellants cannot now complain that such alteration worked to deprive them of a fair hearing in that they were uncertain as to which section of the Ordinance was appropriate for the variance sought.
Appellant asserts the trial court erred in concluding that the Board effectively adopted the judgment dated February 16, 1984. Ms. Ferrara testified that whenever a judgment needed to be drawn, but would not conform to the Board's standardized judgment form, it was her job to draft such judgment. She further stated that she supplied the written reasons for those judgments as she extracted such from the transcript of the hearing in which the judgment was rendered.
The variance in question was granted February 6, 1984. Because of the length of the judgment and the complexity of the hearing, it would not conform to the Board's standard judgment form. Ms. Ferrara drafted a judgment along with the written reasons which were extracted from that hearing's minutes. Appellants contend the judgment appealed, dated February 16, 1984, is not the work product of the Board. We disagree.
We find nothing in the Ordinance to indicate the Board followed improper procedure in the drafting and signing of the judgment. Section XXII(5)(E) of the Ordinance provides four members must concur in any result and Section XXII(5)(F) requires written reasons with every decision. The Ordinance does not stipulate for internal procedures in the Board's preparation of a judgment. Harold Pitre, Board Secretary, signed the decision drafted by Ms. Ferrara on the date indicated in the judgment, namely February 16, 1984. It appears from the record that his was the only Board member's signature required.
It cannot be disputed that the judgment in question, along with its written reasons, was the work product and decision of the four members voting to grant. The transcript of the hearing clearly indicates such. *1303 Whatever error committed, if any, was clearly harmless.

ERRORS 5, 6, 7, 8, 9 AND 10
The property in question is zoned C-2 commercial. The developers of this tract proposed to build a project commonly known as the "Galleria." This project would be a permitted use under current C-2 zoning and could be built within the existing parameters of the Ordinances. If built to conform to existing guidelines, that is without the variance, appellants' own "zoning expert", Louis C. Bisso, stated the Galleria could attain a height of eight stories and would have 41,633,280 cubic feet of building volume with 5,100,000 total square feet.
Tolmas applied for a height variance so that the Galleria could attain a height of 390 feet. If granted, the variance would allow the project to take a more aesthetically pleasing shape with six towers ranging from 210 feet to 390 feet. Appellants' own expert, Mr. Bisso, stated, in fact, that if the project were to be built with the variance, the proposed building area would be smaller than without the variance.
It must be kept in mind that this property is zoned C-2 and that the proposed project is a permitted use under Comprehensive Zoning Ordinance, Section XIV General Commercial DistrictC-2(2) Permitted Uses. Regardless of whatever shape (physical form) the project takes, the impact of the project is relatively the same because the actual total square footage varies little.
The Board's function is not to approve or deny proposed projects; such authority is in the purview of the permit office in reviewing and approving the project's various requirements. The Board's review is limited to the impact the proposed variance will have. When reviewing a variance application, the Board must abide by the limitations set in Section XXII3A, which are in pertinent part, as follows:
"A. Limitations:
In exercising the above mentioned powers, the Board may affirm or reverse wholly or partly or may modify the decision or determination appealed from and may make such other order, requirement, decision or determination as said board may deem proper and within its authority. However, the board shall not render any judgment or make any decision or determination which would constitute a zoning change."
The standards per Section XXII(3)(B) are as follows:
"1. The approval, if granted will not cause any diminution or depreciation of property values of any surrounding property or will not alter the essential character of the locality.
2. The approval, if granted, will tend to preserve and advance the prosperity and general welfare of the neighborhood and community.
3. The approval, if granted, will not be detrimental to the public welfare or seriously affect or be injurious to other property or improvements in the neighborhood in which the property is located, in that it will not: impair an adequate supply of light and air; or increase substantially the congestions in the public streets, create a traffic hazard, or permit inadequate parking; or increase the danger of fire; or substantially affect or overburden existing drainage or sewerage systems; or otherwise endanger the public safety; or cause serious annoyance or injury to occupants of adjoining premises by reason of emission of odors, fumes, gases, dust, smoke, noise or vibration, light or glare, or other nuisances.
Additionally, the Board shall not grant approval of any variance unless it makes a further finding that each case shall indicate the following:
4. Special conditions and circumstances exist which are peculiar to the land, structure, or building involved and which are not applicable to other lands, structures, or buildings in the same zoning district; and the special conditions and circumstances do not result from the intentional actions of the applicant or any other person who may have or had interest *1304 in the property; and the strict adherence to the regulation for the property would result in a demonstrable hardship upon the owner as distinguished from mere inconvenience; or
5. Literal interpretation of the provisions of this ordinance would deprive the applicant of rights commonly enjoyed by other properties in the same district under the terms of this ordinance; and granting the variance requested will generally not confer on the applicant any special privilege which is denied by this ordinance to other lands, structures, or buildings in the same district or similarly situated; and the purpose of the variance is not based exclusively upon a desire to serve the convenience or profit of the property owner or other interested party."
Thus, the standards established by Ordinance XXII(3)(B) provide that the Board may grant a variance if the evidence presented establishes 3(B)(1), 3(B)(2), 3(B)(3), and either 3(B)(4) or 3(B)(5). Because of the use of the disjunctive coordinating conjunction "or," the ordinance does not require that all five requisites be met, only the first three and either (4) or (5).
A review of the record, in light of the above standard, reveals the following:
(1) Would the variance itself cause surrounding property to depreciate and alter the character of the locality?
Separate studies, one by a private real estate consulting firm and the other conducted for the Parish of Jefferson, conclude that property values will increase, not decrease, when the Galleria is complete. The Parish study finds:
"Property values for residences in the study area will likely experience an initial, short term decline in value * * * *
"However, after a period of one to two years property values can be expected to rise at a rate in excess of that which would be experienced without the development. The major factor influencing the property value rise will be the proximity of the Galleria to the neighborhood." (EPL Report, p. XI).
The private study, made by Hebert, Smolkin & Associates, a real estate consulting firm based in New Orleans, included an evaluation of the effect of high-rise construction on Causeway Boulevard on the adjacent residential areas. John Hebert, President of the real estate firm, testified before the Board that if the development is done well and the adverse impact is handled properly, property values would be enhanced. He further testified that a study of homes in the immediate area increased between 1973 and 1983 during the period when numerous office buildings were constructed on Causeway Boulevard. He explained that in 39 case studies that were sales from one individual to another, the resale value of the residence had increased between Three Thousand Dollars ($3,000) and Ninety Thousand Dollars ($90,000). When the interval between sale and resale was greater, the appreciation in value increased proportionately.
In a letter dated December 5, 1983 from William R. Smolkin of Hebert, Smolkin & Associates, Inc., their findings were summarized as follows:
"We have studied the market impact of large-scale development in this area and in nearly every major real estate market in the United States, and recall no single instance where the building of tall office buildings in a suburban location was followed by a decline in re-sale (sic) values of homes situated two or more city blocks away. Instead, the values of such homes have tended to rise in phase with a general rise of home values in good neighborhoods over the past three decades, reinforced by additional demand from persons who work in the nearby buildings.
* * * * * *
"In our opinion, the fact that an overwhelming majority of homes within a few blocks of Causeway Boulevard north of Veterans consistently rose in value during years in which one high rise office building after another was built on that boulevard and all kinds of new commercial construction occurred in that corridor *1305 is conclusive evidence, directly applicable to The Galleria question, that homes two or more blocks away from such development show gains, rather than losses, in the real-world marketplace." (Galleria Report, Land Value).
The two studies were relied on by the Board in granting the variance. No probative evidence was presented to the Board to contradict these opinions. Lawrence N. Powell, Secretary of the Central Metairie Civic Association, raised several rhetorical questions about the validity of the experts' studies on values. He pointed out that the residences located near the Galleria site have a lower market value than those 39 residences utilized in the study and questioned whether it was valid to compare the impact of high-rise construction on Causeway Boulevard with the impact of the Galleria on his neighborhood. Powell's second question was whether the greater magnitude of construction on the Galleria site could be compared with the Causeway corridor development.
Appellants failed to adequately show, through the use of Powells's questioning, that the Board's conclusion that, "... the variance granted will not cause any long term depreciation in value of surrounding property...." was arbitrary, capricious or manifestly erroneous.
(2) Would the variance itself advance the prosperity and welfare of the community?
The record revealed the Galleria, when completed, will produce annual tax revenue estimated between Ten Million Dollars ($10,000,000) and Twelve and A Half Million Dollars ($12,500,000). Offsetting the revenue from the Galleria by the expenses of the Parish for additional services of less than Two Million Dollars ($2,000,000), the Galleria will net almost Ten Million Dollars ($10,000,000) per year in revenue to the Parish.
The Parish study indicates that the Galleria will produce approximately Nine Million Dollars ($9,000,000) in property tax and Three Million Four Hundred Thousand Dollars ($3,400,000) in sales tax. The privately commissioned study projects collection of Six Million Eight Hundred Thousand Dollars ($6,800,000) in property tax, Three Million Dollars ($3,000,000) in sales tax and Two Hundred Thousand Dollars ($200,000) in occupancy taxes. These estimates are based on an examination of the public records of the Parish. Regardless of which study is more accurate, the figures proposed are overwhelming.
The record further indicated that the Galleria is supported by the business community. Representatives of civic groups voiced support for the Galleria variance. Louis Savoie, representing the Executive Committee of the East Jefferson Council of the Chamber of Commerce, views the development to be "... of great beneficial value to the citizens, businesses, and the general economic growth of the East Jefferson Community." Roy Kelly, Chairman of the East Jefferson Council, Chamber of New Orleans and River Region, told the Board:
"... We believe that we cannot summarily dismiss a development in one of the few areas remaining in the Parish that might contribute to the revenues which are so badly needed, as well as the jobs, which we, as a growing community, need, and will continue to need...." Minutes. Feb. 6, 1984 Zoning Appeals Board, p. 28 (Record Vol. 3, p. 532).
Opponents voiced concern over the expense to the Parish to upgrade services to accommodate the Galleria; however, no evidence was presented to contradict the projection that the Parish will increase its annual net revenue significantly even after furnishing the additional services and improvements the Galleria will require.
The record adequately supports the conclusion that the Galleria will advance the prosperity of the community.
(3) Would the variance itself be detrimental to the public welfare?
The only potential problems that the variance itself might create is an interference with light. The two concerns here were the glare reflected from the project's towers and the blocking of the setting sun for some residents located on the east side of *1306 the project. Although these matters were voiced at the February 6, 1984 hearing, it is clear that they were not the major concerns of the opposition and were mentioned only tangentially. The main concerns of the opposition and the ones which they voiced again and again, i.e., traffic, sewerage, and drainage, will not be the result of the variance but of the project itself. The record bears out that the variance itself will not be responsible for whatever detrimental impact the project carries with it.
The developer is permitted under the ordinances to construct the proposed Galleria complex. Whether the result is achieved in a horizontal congested arrangement or a more spacious vertical fashion, the finished product will produce the same demands for roadway improvements to facilitate traffic, expansion of existing drainage and sewerage systems and the collateral increase of other Parish services. In other words, the Galleria can be built with approximately the same square footage, whether or not the variance is granted. Any potential problem that may exist will result from the project itself and not the height thereof. The height variance itself is not detrimental to the public welfare.
(4) Did appellee-applicant satisfy the final requirement of proof; either 3(B)(4) or 3(B)(5)?
Appellee-applicant pursued 3(B)(5) which requires proof that: (a) denial of the request would deprive the applicant of rights that had been granted to other property owners similarly situated; (b) no special privilege is being conferred; and (c) the request is not based exclusively upon a desire to serve the convenience or profit of the owner or other interested party.
The record reflects that fifteen height variances in C-2 General Commercial Districts had been applied for and granted by the Board since the Ordinance was adopted in 1966.[1] It is apparent in reviewing the locations of buildings for which these variances were granted that a majority of those buildings are in the vicinity of the Galleria, the Causeway business corridor. The history of the Board's previous actions on height variance requests is evidence supportive of the conclusion reached by the Board that:
"... a denial would deprive appellant of rights enjoyed by other properties in C-2 Districts which have geen (sic) granted similar variances."
In that a number of height variances have been granted by the Board to other commercial developments in that area, the instant variance is not a special privilege being conferred on the appellee-applicant.
Appellants argue that the variance is sought exclusively to produce greater profits for the appellee. The Board disagreed after reviewing plans, designs and a model of the more attractive and spacious project that is possible with a height variance. Although *1307 counsel for developer admitted the project would be more attractive to prospective tenants and users if allowed to be built with the variance, this alone is insufficient to find that the request was based exclusively upon a desire to serve the convenience or profit of the eventual owner.
One of the goals set forth by the developer of this project is to create an architectural landmark for Jefferson Parish. If built with the variance, the project would include two lakes, fountains, trees, plantings and so forth. Even the Parish's own independent study stated that, if built without the variance, the project would become "a development of considerably less aesthetic appeal." If built with the variance, this project could become a most valuable asset not only to the business community but all of Jefferson Parish as well and would not exclusively serve to produce greater profits for the developer.
The applicable standard of review has been stated by this court in Barkman v. Zoning Appeals Board of Jefferson Parish, 442 So.2d 1237, 1239 (La.App. 5th Cir. 1983):
"Each case must be decided on facts peculiar to it and no general rule can be formulated as to what constitutes hardship or unusual and practical difficulties sufficient to authorize grant of a variance. All relevant factors must be considered.... The court must afford a rebuttable presumption of regularity to the Board's decision.... The Court is obliged to affirm the decision unless there is a clear abuse of discretion by the Board ..., with the burden of proof on the complaining party.
`Although, on one hand, we might disagree with the Board's findings and, on the other hand, ascribe no manifest error to those findings of the district judge, we are obliged to sustain the Board's conclusions unless the weight of the evidence in its entirety so strongly preponderates against such conclusions that it compels us to find an abuse of discretion on the part of the Board.'"
(Citations omitted)
Conforming to the above cited standard of review, we do not find such a strong preponderation of the evidence against the Board's findings as to compel us to find an abuse of discretion. Considering all of the relevant factors presented in the record of this case, we hold plaintiffs-appellants did not carry their burden of proof.
Appellee, Parish of Jefferson, has answered the appeal alleging they are aggrieved by an interlocutory judgment of the trial court dated July 13, 1984, overruling certain of its exceptions and motions and now reurges the same. In addition, appellee, Parish of Jefferson, has filed a peremptory exception of no right of action alleging the same to be filed for the first time in accordance with LSA-C.C.P. Article 2163.
All specifications or assignments of error must be briefed, otherwise such allegations of error will be considered abandoned. Court Rules-Uniform Rules Courts of Appeal, Rule 2-12.4. On appeal, appellee briefed only its exception of misjoinder of parties. Accordingly, that exception will be addressed and appellee's remaining exceptions will be considered abandoned.
Appellee filed an exception of misjoinder of parties asserting that there is no community of interest between the Parish and the parties that appeared in controversy before the Zoning Appeals Board in that appellee has never been either a prevailing or adversary party. In an attempt to sever itself from the instant suit, appellee complains that it should never have been made a party defendant because of the nature of the petition.
Any party aggrieved by the decision of the Zoning Appeals Board may present to the appropriate district court a petition complaining of that decision whereupon the district court may issue a writ of certiorari. Because of the nature of certiorari, appellee argues it never should have been named a party defendant.
Appellee has cited State v. Board of Zoning Adjustments, 251 La. 691, 206 So.2d 74 (La.1968), for the proposition that, when a party seeks judicial relief of an *1308 action by means of a writ of certiorari, that party prays that the writ be directed to the lower tribunal but does not name his adversaries as parties. Appellants however argue that, since a municipality can be a party plaintiff, it can also be a defendant, citing River Oaks, supra. We agree with appellants.
The court in River Oaks, supra, acknowledged that the municipality, by virtue of statutory authority, had the right to appeal any adverse Zoning Board's decision to the district court, thus recognizing the municipality's right to become a party-relator in the district court. We think it is axiomatic that the converse applies and that appellee, Parish of Jefferson, in this case, is properly before this court as respondent.
Accordingly, for the above stated reasons, the judgment of the trial court affirming the decision of the Board to grant the variance is affirmed. Appellee's reurged motions and exceptions are dismissed. Appellants are to pay all costs of this appeal.
AFFIRMED
NOTES
[1] The record indicates that the following height variances were granted:

Number Address Date Disposition
 1414 2200 Jefferson Hwy. May 18, 1964 Granted
 5267 100 Westbank Expwy. Sept. 13, 1971 Granted
 3991 2261 N. Causeway Blvd. Dec. 22, 1969 Granted
 4539 4900 Veterans Blvd. Nov. 10, 1969 Granted
 2964 3500 N. Causeway Blvd. Dec. 11, 1967 Granted
 7079 2728 Metairie Road Dec. 2, 1974 Granted
 6439 3421 N. Causeway Blvd. July 30, 1973 Granted
 6775 4201 Veterans Blvd. April 22, 1974 Granted
 9020 3900 N. Causeway Blvd. July 10, 1978 Granted
 9979 3510 N. Causeway Blvd. Sept. 15, 1980 Granted
 9980 3330 W. Esplanade Ave. Sept. 15, 1980 Granted
10249 3900 N. Causeway Blvd. March 30, 1981 Granted
10577 3217 Melville Dewey Dr. June 22, 1981 Granted
10661 111 Veterans Blvd. Nov. 9, 1981 Granted
 9668 2601 Severn Ave. Jan. 7, 1983 Granted